IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 19, 2010

IN RE **CALEB J. B. W.**

**Appeal from the Juvenile Court for Bradley County**
**No. J-08-391      Daniel R. Swafford, Judge**

_____

**No. E2009-01996-COA-R3-PT - FILED JULY 14, 2010**

_____

This appeal involves the termination of a mother's parental rights to her son. Following a bench trial, the trial court determined that the mother knowingly failed to protect her child by not immediately seeking medical care and by not immediately reporting her child's injuries to medical providers or the authorities. Therefore, the trial court terminated the mother's parental rights. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J. and CHARLES D. SUSANO, JR., J., joined.

Joshua H. Jenne, Cleveland, Tennessee, for the appellant, Kimberly W.

Robert E. Cooper, Jr., Attorney General & Reporter, Michael E. Moore, Solicitor General, and Lindsey O. Appiah, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Sally Love, Cleveland, Tennessee, Guardian ad Litem.

**OPINION**

**I. BACKGROUND**

The Department of Children's Services ("DCS") became involved with the child, Caleb J. C. W. ("the Child" or "Caleb") (d.o.b. 12/26/06) on September 18, 2008, when his

grandmother, Elizabeth Cronan ("Mrs. Cronan"), took him to the hospital after observing his battered and bruised condition at the residence of Kimberly W. ("Mother") and Mother's boyfriend, Steven Brent Lee ("Mr. Lee"). Mrs. Cronan testified as follows:

> A [Mother] told me what happened. I said, I don't believe this is what happened. I believe [Mr. Lee's] lying, something else is going on, I'll take [the Child] to the hospital. Why I didn't take [Mother] with me [to the hospital], I don't know. I wasn't in my right mind. I just got in the van with my [other] daughter and we took [the Child] to the hospital.
>
> Q Did [Mother] ask to go with you?
>
> A I didn't ask her.
>
> Q She didn't say, can I go too?
>
> A No.

Instead of immediately reporting to the hospital, Mother went to her aunt's house to call Mr. Lee.

Tara Corbett, Children's Protective Services Investigator, arrived at the hospital shortly after DCS was called. While waiting for Mother to arrive, Ms. Corbett was able to observe the Child. She described Caleb's face as being "pale green" and noted that he was bruised on every part of his body. Specifically, Ms. Corbett noted, "Aside from his face, I noticed his ear, and his arm was swollen from the middle of his bicep, all the way down to his wrist, it was swollen. His elbow, especially, was at least double the size." Ms. Corbett further observed that Mother did not ask to see her son when she arrived at the hospital.

When Mother was transported to the police station, Ms. Corbett accompanied her. The investigator testified that they discussed the Child's physical condition. Ms. Corbett noted:

> A [W]hen I first walked in, she wanted to make sure that I knew she hadn't done this to her child. I then spoke with her and asked her when it happened. She said it happened on Monday [September 15, 2008]. And I asked her why she didn't take him to the . . . [hospital], and she said she didn't have a vehicle. And I asked her if she went to work on Tuesday. She said she went to work on Tuesday. I asked her how she got there. She said she drove. I asked her if there was a phone at work. She said there was a phone at work. I asked her

if -- when she left for work, was Brent asleep. She said he was asleep. I asked if the baby was awake. She said he was awake. When -- I asked when [Mr. Lee] went to work. She said he went to work on Wednesday. I asked her why she didn't go to the neighbors. She said that the neighbor . . . was out of town. I asked her why she didn't go to any other trailers. She said she didn't know anybody. I asked her why she didn't walk, she's right there, right on Water Level Highway, why she didn't walk to the highway. She said she didn't know. I asked her why she didn't call when she was at work. She said she didn't know. I asked her if the child looked like that on Monday. She said, no, he looked worse. I said, if he looked worse, why didn't you take him. She said, he told me that they would take my baby.

Q By "he," who was she referring to?

A Steven Brent Lee. And I explained to her if she had been protective, if she would have called right then and left him, that the issue was that she did not do anything for those four days.

* * *

Q Did she ever tell you anything about Mr. Lee hitting her?

A No.

Q Did she ever discuss with you episodes that Mr. Lee had been rough with Caleb in the past?

A She did say she was concerned because he had been -- disciplined him too harshly, she felt like he was a little bit too rough with him. . . . [t]hat he would get too aggressive with his punishments . . . .

Q Did she ever say anything else about -- or anything about any other bruising that she had seen?

A Yeah, she said she -- there had been a couple times that she had witnessed bruising on the child and she had been a little concerned, but [Mr. Lee] explained them away . . . . they weren't the extent of the bruises he had now, so she wasn't that concerned about them, but they'd all happened while she was away.

* * *

After leaving the police station, Ms. Corbett accompanied detectives to Mother's home. Ms. Corbett noted that the home was found to be roach-infested. She also indicated that there was not enough food in the cabinets to make a full meal, and there was only beer, condiments, and empty baby bottles in the refrigerator. She testified that she found no milk, formula, juice, or baby food.

Mr. Lee did not immediately admit that he caused the injuries to the Child, but he eventually gave a written statement detailing what he had done. In the statement, Mr. Lee indicated that the Child had been crying and that he had "flipped out." Mr. Lee admitted that he threw the Child in the bed extremely hard and punched him in the face with closed fists approximately three times. According to Mr. Lee, he later "hit at [Caleb] and hit him swinging back" when the Child was crying again. Mr. Lee then "took both hands and smacked at him at the same time on the cheeks." Finally, before putting the Child in his crib, Mr. Lee "pushed him hard into the wall two or three times." Mr. Lee observed at trial that the Child looked like a "punching bag" and was swollen black and blue. He recalled that Mother became very upset by the Child's appearance. Eventually, Mr. Lee was charged with aggravated child abuse and Mother was charged with aggravated assault.

Patrick F. Keegan, M.D., the physician who initially cared for Caleb, reported that the Child sustained the following injuries: a laceration to his liver; three fractured ribs: a fractured left hip; a fractured left elbow; a fractured nasal septum; a fractured left shoulder blade; a possible skull fracture; cigarette burns to the top of his left foot and third toe; trauma to his ear; and extreme bruising all over his body. Dr. Keegan opined that the injury to the arm would have been obvious to anyone. He noted that due to the damage to the artery in the arm, the Child could have lost the arm in as little as three days. The physician observed that the injury to the hip caused it to be very painful for Caleb to walk. He opined that the Child would have been in extreme pain.

Caleb was taken into DCS custody and placed in a foster home on September 24, 2008. The following day, DCS filed a petition for temporary legal custody and to declare the Child dependent and neglected as a result of severe child abuse. Three months later, Mother was ordered to pay support for the Child. However, despite the order of support and Mother's continuous employment, she failed to pay any support for her son.

On August 17, 2009, the juvenile court orally ruled that Mother's rights to the Child were terminated. On September 8, 2009, a court order finalized the termination of Mother's parental rights:

-4-

DCS proved by clear and convincing evidence that this child was severely abused, so the Court adjudicates the child both dependent and neglected and severely abused. When the child appeared at the hospital for emergency treatment, DCS immediately removed him from his mother's care and custody. Based on an assessment of the family and the [child's] circumstances, it was reasonable to make no effort to maintain the child in the home. The child was subject to an immediate threat to the extent that delay for a hearing would be likely to result in severe or irreparable harm. There was and is no less drastic alternative to removal from the mother that will reasonably protect the child's health and safety pending a preliminary hearing. It was and is severe or irreparable harm. It was and is contrary to the welfare of the child to remain in the home. Given the severe abuse, DCS was excused from making reasonable efforts after removal to reunify the child with his mother, pursuant to T.C.A. § 37-1-166(g)(4). DCS has made reasonable efforts since the removal to provide permanency for the child by filing the TPR petition and seeking an appropriate permanent home for him.

The severe abuse also provided grounds for termination of the mother's parental rights exist pursuant to T.C.A. §§ 36-1-113(g)(4) and 37-1-102(b)(21).

DCS also proved by clear and convincing evidence that termination of the mother's parental rights is in the child's best interests, pursuant to T.C.A. § 36-1-113(i).

Mother filed a timely notice of appeal.

## II. ISSUES

Mother questions whether the trial court erred in finding that she committed "severe child abuse" as defined by Tenn. Code Ann. § 37-1-102(b)(21)(A), and whether severance of her parental rights is in the Child's best interest.

## III. STANDARD OF REVIEW

We employ the following standard of review in cases involving the termination of parental rights:

> [T]he Court's duty . . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III,* 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id.*; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 Ed.2d 551 (1972); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) (rev'd on other grounds, *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999)); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right is "among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code. Ann. § 36-1-11(1)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon a finding of appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. Tenn. Code Ann. §36-1-113 is a statue governing termination of parental rights in this state. A parent's rights may be terminated only upon "(1)[a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2)[t]hat termination of the parent's or guardian's rights is in the best interest of the child." Tenn. Code Ann. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). The existence of at least one statutory basis for

termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (abrogated on other grounds, *In re Aubrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App.1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.,* 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

## IV. DISCUSSION

### A.

Mother's primary challenge to the trial court's termination of her parental rights focuses on the court's determination that her failure to protect the Child from Mr. Lee was "knowing" for the purpose of Tenn. Code Ann. § 37-1-102(b)(21). It is Mother's position that her conduct was not "knowing" because she was neither present nor a participant in any of the abusive conduct.

Tenn. Code Ann. § 36-1-113(g)(4) gives the courts the power to terminate the parental rights of parents who have committed severe child abuse upon their own child or any other child residing in their home. Even parents who have not themselves severely abused their child, or any other child residing in their home, may still be found to have committed severe child abuse if they knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse. Tenn. Code Ann. § 37-1-102(b)(21)(A)-(C).

Tenn. Code Ann. § 37-1-102(b)(21) defines "severe child abuse" as:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

(B) Specific brutality, abuse or neglect toward a child which in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; or

(C) The commission of any act toward the child prohibited by §§ 39-13-502-39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child;

\* \* \*

As noted in *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at \* 7 (Tenn. Ct. App. M.S., July 13, 2004), the terms "knowing" and "knowingly" are not defined in Tenn. Code Ann. § 37-1-102 or in any other statute pertaining to proceedings to terminate parental rights or other civil proceedings involving juveniles. Because the parties have not supplied us with definitions of these terms, statutory or otherwise, we will employ the basic rules of statutory construction to ascertain their meaning. Accordingly, we will give these words their natural and ordinary meaning, *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001), and we will construe them in the context of the entire statute and the statute's general purpose. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000).

We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly" when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her. *In re R.C.P.*, 2004 WL 1567122, at \*7. Accordingly, parents who are present when a child is abused, but who fail to intervene to protect the child, have knowingly exposed the child to or have failed to protect the child from abuse. *Id.; see* Tenn. Code Ann. § 37-1-102(b)(21). However, the "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21) is not limited to parents who actually are present when severe abuse occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. *In re R. C. P.*, 2004 WL 1567122, at \*7 (citing *West Va. Dep't of Health & Human Res. ex. rel. Wright v. Doris S.*, 475 S.E.2d 865, 878-79 (W. Va. 1996)). Therefore, we must determine whether Mother had specific reason to know but deliberately or recklessly ignored that Mr. Lee had severely abused the Child or that it was highly probable that Mr. Lee would severely abuse the Child.

Neither Mother nor DCS contend that Mother was present at any time when Mr. Lee abused the Child. However, the record contains evidence and Mother admits that she was aware of the possibility that Mr. Lee may have abused the Child on Monday. Mother also testified that Mr. Lee had on multiple occasions abused Mother,[1] and Mother testified that she was aware that Mr. Lee was the subject of an order of protection that prohibited him from having contact with his own child. This knowledge, together with the Child's condition as Mother found him on Monday, made it likely and highly probable that Mr. Lee had abused the Child.

In the two weeks that Mother left her son in Mr. Lee's care, she found multiple bruises about the Child's body. When Mother returned from work on September 15, upon picking the Child up out of his crib, she noticed that both of his cheeks were red and one of his arms was swollen. According to Mr. Lee, Mother "flipped out" when she saw the Child's appearance, but Mother, like on previous occasions, chose to believe Mr. Lee's assertion that the Child became injured when he fell from Mr. Lee's hands while the two were playing. Despite the Child's appearance and obvious need of attention, Mother did not seek medical attention for her son.

The following day, Mother went to work and left the Child in Mr. Lee's care once again. Mother stated that she did not seek medical attention for Caleb because she feared Mr. Lee. However, two days later, Mr. Lee left Mother at home with the Child while he went to work. Even though Mother noticed more bruising on her son's back while she bathed him, she did not make any attempt to get Caleb to the hospital.

A reasonable person possessing the information that Mother possessed would have inferred that abuse was possibly occurring. Mother admitted that whenever she allowed Mr. Lee to watch the Child, her son would have unexplained bruises. She admitted that Mr. Lee would "go overboard" in his discipline of the Child. She admitted that Mr. Lee had been physically abusive toward her before he moved into her home. Mother insists that she was motivated by her fear of Mr. Lee to keep quiet about the Child's injuries, but even in instances where Mr. Lee was not around, she did not utilize her available resources at work or when Mr. Lee left for work. Mother, by deliberately and recklessly ignoring the obvious signs of abuse and by failing to seek proper medical care for the Child, committed severe child abuse as defined by Tenn. Code Ann. § 37-1-102(b)(21).

Mother contends that in our opinion in *State of Tennessee, Department of Children's Services v. H.A.C.*, No. M2008-01741-COA-R3-JV, 2009 WL 837709 (Tenn. Ct. App. M.S., Mar. 26, 2009) is factually similar and controlling in the case at bar. In *H.A.C.*, the mother

---

[1]Mr. Lee testified at trial that he "never touched" Mother.

was charged with the commission of severe child abuse. *Id.* at *1. Like this case, it was determined that the mother was not the person who physically committed the child abuse. *Id.* at *2. The trial court found the child to be dependent and neglected partly based upon the finding that the mother had committed severe child abuse. *Id.* at *2. In reversing the decision of the trial court, we focused on the fact that the mother had previously been very attentive to the child's medical needs. We noted in *H.A.C.*:

> There is no direct evidence to establish that mother knowingly abused the child or that she knowingly failed to protect the child from severe abuse . . . . Further, mother's affirmative actions, including frequently taking the child to receive appropriate medical care, are inconsistent with those of a parent who knowingly harms a child or knowingly allows another to harm the child. . . .

*Id.* at *4. In this case, Mother notes that Mr. Lee did not come into her life until around July 2008, when the Child was approximately 18 months old. During the first 18 months of Caleb's life, Mother had taken the Child for medical treatment on 25 different occasions. She argues that per our decision in *H.A.C.*, such behavior is not consistent with someone who would knowingly expose a child to harm.

Our *H.A.C.* decision notes that "the fact that Mother frequently took her child to receive medical attention would not be a defense if there were clear and convincing proof that Mother . . . knowingly failed to protect the child from abuse." *Id.* at *4. In this case, it was apparent to Mother that the Child had been abused, yet she continued to leave her son in Mr. Lee's care and neglected to obtain medical treatment for him when she had the opportunity to do so. Her actions knowingly placed the Child at risk for further abuse. This case clearly differs from *H.A.C.*, as unlike the parent in that matter, Mother in the instant case failed to seek treatment for Caleb's injuries after the abuse. Thus, the record supports the finding of the trial court of clear and convincing evidence that Mother violated Tenn. Code Ann. § 36-1-113(g)(4) by knowingly failing to protect her son from Mr. Lee's severe child abuse.

B.

We must consider whether clear and convincing evidence also supports the trial court's conclusion that it was in the best interest of the Child to terminate Mother's parental rights. We are guided by the non-exclusive list of factors provided in Tenn. Code Ann. § 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in

the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). As this court has noted, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed." Tenn. Code Ann. § 36-1-101(d). *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In the instant case, the Child is now in a safe and stable home with foster parents who love him and want to adopt him. He has had no contact with Mother in over a year. A change of caretakers and physical environment would likely have a detrimental effect on the Child's emotional and psychological condition. We do not doubt that Mother loves her son, but she failed him miserably when she sacrificed his health and safety for a relationship with an abusive boyfriend. Further, Mother has paid no support for Caleb despite a court order to do so. Accordingly, the record contains clear and convincing evidence that terminating Mother's parental rights is in the Child's best interests.

## V. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Kimberly W. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and for the collection of costs assessed below.

_____
JOHN W. McCLARTY, JUDGE